Filed 9/18/23 (unmodified opinion attached)

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C095414 |
| Plaintiff and Respondent, | (Super. Ct. No. CR2020968) |
| v. | ORDER MODIFYING OPINION, DENYING REHEARING, AND CERTIFYING OPINON FOR PARTIAL PUBLICATION |
| FERMIN PEREZ-ROBLES, | |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

APPEAL from a judgment of the Superior Court of Yolo County, David W. Reed, Judge. Affirmed in part and reversed in part.

Charles M. Bonneau, Jr., Retained Counsel for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts IA, IB, ID, IIA, and III through V of the Discussion.

1

THE COURT:

It is ordered that the opinion filed herein on September 6, 2023, be modified as follows:

1. On page 17, in the first full paragraph, second sentence, the words "borders on the ludicrous" are deleted and replaced with "is not persuasive" so the sentence reads:

> This argument is not persuasive, and, tellingly, is accompanied by no citation to the record.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

The opinion in the above-entitled matter filed on September 6, 2023, was certified for partial publication in the Official Reports with the exception of parts IA, IB, ID, and II through V of the Discussion. For good cause it now appears the partial publication should be expanded to include part IIB of the Discussion, and is so ordered.

BY THE COURT:

_____/s/_____
EARL, P. J.

_____/s/_____
MAURO, J.

_____/s/_____
KRAUSE, J.

Filed 9/6/23 (unmodified opinion)

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u><sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C095414 |
| Plaintiff and Respondent, | (Super. Ct. No. CR20202968) |
| v. | |
| FERMIN PEREZ-ROBLES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Yolo County, David W. Reed, Judge.  Affirmed in part and reversed in part.

Charles M. Bonneau, Jr., Retained Counsel for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

---

<sup>*</sup>  Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts IA, IB, ID and II through V of the Discussion.

Defendant Fermin Perez-Robles, a massage therapist, was convicted by a jury on 16 counts of sexual penetration and sexual battery involving six clients and sentenced to 15 years in prison. He argues (1) the evidence is insufficient to support his conviction on 10 counts, including those for sexual battery by restraint; (2) the jury was not properly instructed on lesser included offenses on four counts; (3) the jury was improperly instructed on using other charged sex offenses as propensity evidence; (4) the prosecutor misstated the law during closing argument; and (5) the imposition of the upper term sentence on one count must be reversed and remanded based on recent changes to Penal Code section 1170 (further undesignated statutory references are to the Penal Code). We agree the evidence is insufficient to support one count (count 4); although there was sufficient evidence of restraint, the jury should have been instructed on lesser included offenses on two counts (counts 14 & 20); and the imposition of the upper term sentence on count 11 must be vacated and remanded for resentencing. In all other respects, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant is a massage therapist. In 2011, he opened a business called Heal the Body inside of a shopping mall. The business closed in around 2014, and defendant began doing massages out of his home. In early 2019, he began working at Woodland Chiropractic and Wellness, a business owned by a chiropractor named Dr. James Newell, which we will refer to as the "Wellness Center."

In February 2021, defendant was charged with numerous counts of sexual penetration and sexual battery. The charging document was amended several times, and by the time the case went to trial, there were a total of 38 counts involving nine clients. Although the specifics were different as to each victim, all of them claimed defendant touched them inappropriately during a massage. We will discuss the relevant facts regarding the specific counts in the discussion section, below.

2

During trial, the prosecutor dismissed three of the 38 counts, and 35 counts were submitted to the jury. The jury found defendant guilty on 16 counts involving six victims, as follows: counts 3 and 4, sexual penetration by force (§ 289, subd. (a)(1)(A)), involving victim R.B.; count 7, sexual battery by misrepresentation of professional purpose (§ 243.4, subd. (c)), involving victim A.G.; count 11, sexual penetration by misrepresentation of professional purpose (§ 289, subd. (d)), involving victim E.M.; count 14, sexual battery while the victim is restrained (§ 243.4, subd. (a)), and count 15, misdemeanor sexual battery (§ 243.4, subd. (e)(1)), involving victim D.E.; count 20, sexual battery while the victim is restrained (§ 243.4, subd. (a)), and counts 21 and 22, sexual battery by misrepresentation of professional purpose (§ 243.4, subd. (c)), involving victim C.E.; and counts 30 through 35 and 37, sexual battery by misrepresentation of professional purpose (§ 243.4, subd. (c)), involving victim Y.G.

The jury found defendant not guilty on four counts and was unable to reach a verdict on the remaining 15 counts.

Defendant was sentenced to an aggregate term of 15 years, calculated as follows: the upper term of eight years on count 11; two years (one-third the middle term) on count 3; and one year each (one-third the middle term) on counts 7, 14, 20, 30, and 37. Defendant was also sentenced to the upper term of four years on count 22 and to 180 days in county jail on count 15, both to be served concurrently. Sentences on the remaining counts were imposed and stayed pursuant to section 654.

Defendant timely appealed.

## DISCUSSION

## I

### Sufficiency of the Evidence

Defendant argues that the evidence is insufficient to support his conviction on 10

counts (counts 3, 4, 11, 14, 20, 31, 32, 33, 34, and 35).[1]

"In determining the sufficiency of the evidence to support a conviction, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Leon* (2008) 161 Cal.App.4th 149, 156, italics omitted.) We review "the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "The uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable. Th[is] rule is applicable to sex [offense] cases." (*People v. Scott* (1978) 21 Cal.3d 284, 296.) " ' "A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." ' " (*People v. Livingston* (2012) 53 Cal.4th 1145, 1170.) " ' " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " (*People v. Burney* (2009) 47 Cal.4th 203, 253.) The "relevant question" is thus "not whether *we* are convinced beyond a reasonable doubt, but whether *any* rational trier of fact could have been persuaded beyond a reasonable doubt that defendant" committed the crime. (*People v. Perez* (1992) 2 Cal.4th 1117, 1127.)

### A.    Counts 3 and 4—Victim R.B.

In counts 3 and 4, defendant was convicted of sexual penetration of R.B. by force,

---

[1]    He does not challenge the sufficiency of the evidence regarding the remaining six counts (counts 7, 15, 21, 22, 30, and 37).

violence, duress, menace, or fear, in violation of section 289, subdivision (a)(1)(A).[2]  He argues there is insufficient evidence of force, violence, duress, menace, or fear as to both counts, and insufficient evidence of sexual penetration as to count 4.

    *1.      Relevant facts*

    R.B. received two massages from defendant in the summer of 2020.  Counts 3 and 4 both involved the second massage, and our description of the first massage is thus abbreviated.

    R.B. had a neck injury and was referred to the Wellness Center by her father, who had been a patient of Dr. Newell's for years.  R.B. walked into the clinic on June 22 without an appointment, and was able to see defendant that same day.  She offered conflicting testimony on whether defendant touched her labia during the first massage.  On re-direct examination, she stated she was "unsure right now" whether he did so.  At the end of the first massage, R.B.'s neck felt a little better, and she scheduled a second massage.

    The second massage started the same way the first one did.  Defendant left the room while R.B. got undressed, lay facedown on the table, and covered herself with a sheet.  Defendant came back into the room and began massaging R.B. from her shoulders to her lower back.  While massaging her arms, he lifted them in a way that exposed her breasts, and she could feel air on her nipple area.  Defendant then moved to her legs.  R.B. testified that when he moved the sheet to the inside of her legs, it did not feel as secure as it had during the first massage.  He massaged up and down each leg several times and touched her labia.  He then put his left hand underneath her pelvis and placed one of his fingers directly on her clitoris.  He started moving his fingers back and forth on her clitoris.  He did this about five times before R.B. realized she had gotten excited and

---

**2**    Counts 1, 2, 5, and 6 also involved R.B.  The jury returned not guilty verdicts on counts 1 and 2, and was unable reach a verdict on counts 5 and 6.

"wet down there." She testified she "blanked for maybe one or two rubs, and then I kind of came to and was like, wait a minute, I'm getting aroused in a professional massage. This has to stop." She said, "Okay," and defendant stopped.

R.B. was asked what was going through her mind when this was happening, and she responded, "I . . . was . . . really . . . scared because I was like, well, I'm laying on the table naked. I really don't know what's going on. I don't know . . . if that was supposed to happen or not. But I knew I was sexually aroused, which I knew was not supposed to happen in a professional setting, professional massage. So I was kind of just like trying to play dead in a sense and just stay there just because I was so scared and nervous about what was going on. [¶] . . . [¶] . . . I felt like if he could touch me in what I think is inappropriate, there's no telling what else he could do to me. [¶] I know the last time when I made the appointment around the same time, there was nobody else in the office because it was lunchtime. So this appointment was kind of the same timeframe, so I figured no one else was in the office if anything was to happen. Again, I was naked. I honestly don't know if I could fight him off. I am in his territory, his domain. And again, if he feels he can touch me in an inappropriate way, there's no telling what else he could do to me."

Defendant next had R.B. turn over onto to her back and he massaged her arms and chest area. As he massaged her chest, his hands went around both breasts and he "grope[d]" them. R.B. did not say anything, but just lay there "playing dead." When asked what she was thinking when defendant groped her breasts, she responded, "I was blank. I just didn't have any thoughts." "I just didn't want to be there."

When defendant said the massage was over, R.B. told him her neck still hurt, and he did a couple "twists and turns" and her neck felt better. R.B. paid for the massage and left. As soon as she left the clinic, she felt like she had been "violated," and she started to cry. When she got to her car, she called the California Massage Therapy Board and asked if it was appropriate for a massage therapist to touch a client's breasts, vagina or

6

clitoris, and she was told no.  After calling a friend and her father, she went to the police station and reported what had happened.

Defendant testified in his defense.  He denied touching R.B.'s vagina, labia, or clitoris, and he agreed it would be inappropriate to do so.

2.    *There is insufficient evidence of sexual penetration to support the conviction on count 4.*

Defendant argues there was insufficient evidence of sexual penetration to support his conviction on count 4.  The People agree and we do as well.

The jury was instructed with CALCRIM No. 1045 that in order to prove sexual penetration by force, in violation of section 289, subdivision (a)(1), the prosecution had to prove that (1) defendant committed an act of sexual penetration with another person; (2) the penetration was accomplished by using a foreign object; (3) the other person did not consent to the act; and (4) defendant accomplished the act by force, violence, duress, or fear of immediate and unlawful bodily injury to another person.  The instruction further defined "sexual penetration" as "penetration, however slight, of the genital . . . opening of the other person for the purpose of sexual abuse, arousal, or gratification." (CALCRIM No. 1045.)  The female genitalia includes the labia, the clitoris, and the vagina.  (See *People v. Quintana* (2001) 89 Cal.App.4th 1362, 1367.)  Penetration of the labia, or going into or between the labia, thus constitutes sexual penetration within the meaning of section 289.  (See i*d.* at pp. 1366-1367; *People v. Icke* (2017) 9 Cal.App.5th 138, 148 (*Icke*).)

In the operative charging document when the case proceeded to trial, count 3 parenthetically noted "clitoris," and count 4 parenthetically noted "labia," and the verdict forms for those counts contained the same notation.  Count 3 was based on R.B.'s testimony that defendant touched her clitoris, and defendant does not challenge the sexual penetration element of that count.  Nor could he, because case law teaches that contact with the clitoris, which is located inside the labia, constitutes sexual penetration within

7

the meaning of section 289. (*People v. Quintana, supra*, 89 Cal.App.4th at p. 1371.) He does challenge the sexual penetration element of count 4, which is based on R.B.'s testimony that he touched her labia while massaging her legs. Defendant argues R.B. did not testify he penetrated or went inside or between her labia, and, as noted above, the People agree there is insufficient evidence of penetration to support the verdict in count 4. Even the prosecutor conceded during closing argument that R.B. testified defendant touched her labia, but "[s]he didn't say anything about him going past, however, slight, those labia lips." The prosecutor thus told the jury it should find defendant not guilty of sexual penetration on count 4, but guilty of the lesser included offense of sexual battery.[3]

Having reviewed R.B.'s testimony in its entirety, we agree she did not testify he penetrated her labia when he massaged her legs. We thus reverse defendant's conviction on count 4.

### 3. *There is sufficient evidence of fear or duress to support the conviction on count 3.*

Count 3 required proof the sexual penetration was accomplished "by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury." (§ 289, subd. (a)(1)(A).) During closing argument, the prosecutor stated her theory was that the penetration was accomplished by means of fear or duress, and she acknowledged there was no allegation that force was used. Defendant argues the evidence does not support a finding of fear or duress. We disagree.

The jury was given CALCRIM No. 1045, which defines fear and duress. It instructs, "*Duress* means a direct or implied threat of force, violence, danger, or hardship, that is enough to cause a reasonable person of ordinary sensitivity to do or submit to something that he or she would not otherwise do or submit to. When deciding whether

---

[3] The jury nonetheless found defendant guilty as charged on count 4. As discussed below, sexual battery is not a lesser included offense of unlawful sexual penetration.

the act was accomplished by duress, consider all the circumstances, including the age of the other person and her relationship to the defendant." This instruction accurately states the law (see *People v. Senior* (1992) 3 Cal.App.4th 765, 775), and defendant does not challenge it. CALCRIM No. 1045 also instructs, "An act is *accomplished by fear* if the other person is actually and reasonably afraid or is actually but unreasonably afraid and the defendant knows of her fear and takes advantage of it." Again, this instruction accurately states the law (see *People v. Iniguez* (1994) 7 Cal.4th 847, 856-857 (*Iniguez*)), and defendant does not challenge it. So defined, a reasonable jury could have found that defendant sexually penetrated R.B., and that the act was accomplished by means of fear or duress.

R.B. was in an extremely vulnerable position when the sexual penetration occurred. She was completely naked, lying facedown on a massage table, in a room with the door closed. She was expecting a professional massage, not a sexual assault. It was lunchtime, and she believed nobody else was in the office because nobody else was in the office during her first massage, which had occurred around the same time. She testified she initially "blanked" when defendant touched her clitoris, and then she felt "scared and nervous," felt "trapped," and tried "to play dead." She thought if defendant could touch her labia and her clitoris during a massage, "there's no telling what else he could do to me." He was bigger than she was. She explained, "I honestly don't know if I could fight him off. I am in his territory, his domain." She felt her best way to "survive" was to just "lay[] there." Based on R.B.'s testimony, a reasonable jury could find she submitted to defendant's sexual penetration because she feared he would escalate his assault if she resisted, that her fears were reasonable, and that defendant thus accomplished the penetration by means of fear and/or duress.

*Iniguez, supra*, 7 Cal.4th 847 is instructive. The victim in that case was spending the night at a friend's house and was asleep on her stomach. She awoke when she heard movements behind her. She observed the defendant (the friend's fiancé) approach her

9

from behind.  The defendant then pulled her pants down, and inserted his penis inside her.  She testified she was afraid, so she just lay there.  The defendant ejaculated quickly, got off her, and left.  (*Id.* at pp. 851-852.)  The victim told the police that when she realized what was happening, she " 'froze,' " and she was afraid if she said or did anything, the defendant could turn violent, so " 'she decided just to lay still, wait until it was over with and then get out of the house as quickly as she could.' "  (*Id*. at p. 852.)  The defendant was convicted of rape by force or fear, and the Court of Appeal reversed, finding no evidence of force or fear because the defendant did nothing to suggest he intended to injure the victim.  (*Id.* at pp. 853-854.)

Our Supreme Court reversed, finding there was substantial evidence the rape was accomplished by means of *fear*.  In so finding, it noted studies have shown some women react to sexual assault by freezing and becoming " 'helpless from panic and numbing fear,' " rather than fleeing or actively resisting.  (*Iniguez, supra*, 7 Cal.4th at p. 855; see also *People v. Barnes* (1986) 42 Cal.3d 284, 299-300 [discussing studies showing some women react to sexual assault with a " 'frozen fright' response [that] resembles cooperative behavior"].)  It noted the victim testified she froze because she was afraid, and even if she had not so testified, fear "may be inferred from the circumstances." (*Iniguez*, at p. 857.)  It found, "Any man or woman awakening to find himself or herself in this situation could reasonably react with fear of immediate and unlawful bodily injury. Sudden, unconsented-to groping, disrobing, and ensuing sexual intercourse while one appears to lie sleeping is an appalling and intolerable invasion of one's personal autonomy that, in and of itself, would reasonably cause one to react with fear."  (*Id*. at p. 858.)  Finally, it concluded, "The jury could reasonably have concluded that under the totality of the circumstances, this scenario, instigated and choreographed by defendant, created a situation in which [the victim] genuinely and reasonably responded with fear of immediate and unlawful bodily injury, and that such fear allowed him to accomplish sexual intercourse with [her] against her will."  (*Id*. at p. 859.)

While the case before us is factually distinguishable from *Iniguez*, there are some important similarities. Like the victim in *Iniguez*, R.B. essentially froze in fear when defendant touched her inappropriately during the massage. She testified she was "scared and nervous" and tried to "play dead" and just "lay[] there" in order to "survive" because "if he feels he can touch me in an inappropriate way, there's no telling what else he could do to me." Even if R.B. had not so testified, we would not hesitate to infer fear from the circumstances she found herself in. To paraphrase *Iniguez*, sudden, unconsented-to, and unexpected sexual penetration during what was supposed to be a professional massage is an appalling and intolerable invasion of one's personal autonomy, not to mention an appalling and intolerable breach of professional norms, that, in and of itself, would reasonably cause one to react with fear. (*Iniguez, supra*, 7 Cal.4th at p. 858.) And, as in *Iniguez*, the jury in this case could reasonably have concluded that, under the totality of the circumstances, defendant created, instigated, and choreographed a scenario that put R.B. in genuine and reasonable fear of immediate and unlawful bodily injury, and that such fear allowed defendant to sexually penetrate her against her will. For similar reasons, the jury could also reasonably have concluded that defendant's actions and conduct communicated to R.B. an "implied threat of . . . danger" (namely, escalating from touching her clitoris to something worse); that this implied threat was enough to cause her to " 'acquiesce[]' " (*People v. Senior, supra*, 3 Cal.App.4th at p. 775) or "submit to something . . . she would not otherwise . . . submit to" (i.e., she lay there and played dead); and that the penetration was thus accomplished by means of duress. (CALCRIM No. 1045 [defining duress]; see *Senior*, at p. 775 [same].)

Defendant argues R.B.'s fear was unreasonable because she "was in a commercial office building in the middle of the day, with people coming and going; [and] someone came into the room during the massage and rummaged around for papers." This argument ignores R.B.'s testimony that the first and second massages both occurred around lunchtime, when she "figured no one else was in the office if anything was to

11

happen." Even if she had not so testified, and for the same reasons just articulated, we conclude the jury could find defendant's actions put R.B. in *reasonable fear* of immediate and unlawful bodily injury even though the massage occurred in a commercial building during business hours. As for someone coming into the room during the massage, R.B. testified she was facedown when this happened, she heard the door open, heard somebody walk in and go to defendant's desk area, heard something like papers shuffling, and then heard them leave and close the door. We are not convinced that an unidentified person coming into the room at an unspecified time rendered R.B.'s fear unreasonable. Given the totality of the circumstances, a reasonable jury could find R.B.'s fear that "there's no telling what else he could do to me" was reasonable, and that she submitted or "played dead" in order to survive.

### B.     Count 11—E.M.

In count 11, defendant was convicted of sexual penetration of E.M. while she was "unconscious" or unaware "of the essential characteristics of the act due to the perpetrator's fraudulent representation that the sexual penetration served a professional purpose when it served no professional purpose," in violation of section 289, subdivision (d)(4).[4] Defendant argues there is insufficient evidence (1) that E.M. was unaware of the essential characteristics of the act, or (2) that he fraudulently represented it served a professional purpose. We disagree.

#### 1.     *Relevant facts*

E.M. received two massages from defendant in the summer of 2017. She was 39, and her husband had recently passed away. She was feeling anxious and depressed, and was suffering from what she described as a "breakdown." She was referred to defendant by a friend who thought defendant might be able to help her relax. E.M. had never had a

---

[4]     The jury was unable to reach a verdict on two other counts involving E.M. alleging sexual battery by misrepresentation of professional purpose.

professional massage before.

The massage was performed at defendant's house, in a room that appeared "professional" and "legitimate." There were pictures of the human body and certificates on the walls, and the room contained candles and music, a skeleton of the body, and a massage table. Before the massage began, E.M. told defendant about her husband's passing, and her depression and anxiety. Defendant said he could help her.

Defendant instructed E.M. to take off her clothes and he stepped out of the room while she did so. She undressed to her bra and underwear, and when defendant came back into the room he told her she had to remove them so he could work on her "properly." Defendant stepped out of the room again, and E.M. removed her bra and underwear, lay facedown on the massage table, and covered herself with a sheet. Defendant came back into the room and began the massage, starting with her hands, shoulders, and back. He said he could feel the tension in her body and could tell she was stressed. E.M. testified the massage was "normal" up until this point.

After about 25 or 30 minutes, defendant had E.M. flip over onto her back. He started touching her breasts. She initially thought this was part of the massage, and that it was not sexual. Defendant told her, "Let me heal you," "be open minded," and "relax," and she tried to do so.

Defendant then began massaging her thighs. He massaged her thighs for two or three minutes, "and then he suddenly . . . just put his fingers inside me," "[i]n my vagina." She testified he put his fingers in her vagina "repeatedly." Initially she "didn't think it was . . . sexual," but she was "confused" and it "didn't feel okay." She started questioning whether it was "right or wrong." Defendant told E.M. he was "healing" her, and he said, "You're going to be fine, . . . this is going to help you." She was "shocked" and "dazed," and she wondered how this was really helping her. She "did not understand how . . . his fingers in my vagina would heal me, . . . would heal my mental state." She testified she was "confused," and "one side of me wanted to get better, and another side

13

of me felt like it was incorrect."

E.M. told defendant she was "done," and the massage ended. Defendant stepped out of the room while E.M. got dressed. When defendant came back into the room, E.M. was sitting on the sofa crying and having what she described as "a little meltdown," and he tried to comfort her. He told her he could understand what she was going through after her husband's death and he could help her. He told her she should come back for another massage. She was "confused," but she thought maybe "he could help me" and "maybe he didn't do this intentionally." She paid for the massage and left. When asked why she didn't contact the police, she responded, "I felt like he was trying to heal me."

E.M. scheduled a second massage several weeks after the first. It went much like the first massage. She started out facedown on the table, and this portion of the massage was "normal." When she turned over, however, defendant touched her breasts. He told her he could feel her anxiety and see her depression and said he was making her better. Next he massaged her thighs. When he got close to her vagina, E.M. said she didn't want him to touch her there. He told her she was being "closed-minded" and was not going to get better if she kept "holding back," but he did not touch her vagina. During the second massage, E.M. felt like she had been taken advantage of, and she was not "buying it" when he said he was "healing" her. When the massage ended, she paid and left.

Several weeks later, E.M. got sick and defendant came over to her house to talk. She told him she was anxious and having trouble sleeping. She testified that while at her house, he unzipped his pants and pulled his penis out and asked her if she wanted to suck it, and she said no. She testified he grabbed her hand and tried to get her to touch his penis, telling her that women loved his big penis. He did not force her to do anything, but he told her she needed to have more sex and be less closed-minded. She asked him to leave, and he did.

Defendant testified he met E.M. through a mutual acquaintance who tried to set them up. He had no specific memory about either the first or second massage, but he

14

denied ever touching or penetrating her vagina. He testified E.M. contacted him a few weeks after the second massage and said she needed to talk to somebody so he went over to her house. They sat on the couch, and E.M. put her head in his lap. E.M.'s daughter came in and said hi. Defendant denied taking out his penis. That was their last contact.

2. *Sufficient evidence of misrepresentation of professional purpose supports the conviction in count 11.*

Section 289, subdivision (d)(4) prohibits sexual penetration of someone who is unaware "of the essential characteristics of the act due to the perpetrator's fraudulent representation that the sexual penetration served a professional purpose when it served no professional purpose." This provision "was enacted 'to close the loophole' that allowed defendants who committed sexual acts on their patients under the guise of medical treatment to escape punishment for their conduct." (*People v. Pham* (2009) 180 Cal.App.4th 919, 926 (*Pham*).) "[T]he law represents a clear 'legislative judgment[] that fraud and coercion are totally inappropriate in certain alliances between holders of positions of trust and their patients.' " (*Ibid*.; see also *Icke, supra*, 9 Cal.App.5th at p. 144.) "In keeping with the statute's intent to criminalize sexual acts committed under the guise of professional services, it only makes sense to consider the totality of the defendant's conduct—not just his verbal statements—in determining whether he fraudulently represented the nature of his actions. After all, actions often speak louder than words.' " (*Pham*, at p. 926.) Accordingly, "the representation need not be an express verbal statement; physical circumstances and a course of conduct may indirectly communicate a false professional purpose." (*Icke*, at p. 147.)

In *Pham, supra*, 180 Cal.App.4th 919 the court discussed this provision's application in a case involving a chiropractor who touched the breasts, vagina, and buttocks of several patients during massages. The court noted, "We must . . . be mindful of the fact that, when it comes to treating their patients, physicians occupy a position of implicit trust. A medical professional 'who holds him or herself out to the public as one

15

available to administer to the medical needs of patients through examination and treatment is burdened with the duty to act for medical purposes in dealing with patients seeking medical care. There is an inherent trust and confidence which a patient seeking medical care places in the [professional] and upon which a patient relies in allowing the [professional] access to the most intimate parts of the body.' " (*Id.* at p. 926.) We find this passage equally applicable to the relationship between massage therapists and their clients. Like physicians, massage therapists hold themselves out to the public as providers of stress relief, relaxation, and therapeutic treatment, and they occupy a position of implicit trust when treating clients. Clients, in turn, rely on that trust and the implicit representation of professionalism when allowing massage therapists to touch their naked or semi-naked bodies.

*Icke, supra*, 9 Cal.App.5th 138 is instructive. In that case, a chiropractor (Icke) was convicted under section 289, subdivision (d)(4) of sexually penetrating a patient (Jane Doe) during a massage. Icke had treated Doe for several months. During their last session, Icke massaged her thighs with Benzocaine for pain relief. As he massaged up her legs his fingers penetrated her labia. Doe was not sure whether the contact was purposeful or accidental. (*Icke*, at pp. 141-142.) When the Benzocaine started to burn inside her vagina, she told Icke he was " 'getting a little too close down there,' " and, " 'It's starting to burn.' " (*Id.* at p. 142.) Icke stopped and apologized. The court found this evidence was sufficient to support Icke's conviction because, even though he never told Doe he was touching her labia for a professional purpose, "*the context in which the touching occurred*—an appointment with Icke for the specific purpose of providing Doe a final chiropractic treatment session as the culmination of a several-month course of such treatment that included regular chiropractic massage—*was sufficient to communicate a purported professional purpose for all of the touching Icke engaged in while Doe lay on a treatment table*." (*Id.* at p. 147, italics added.)

So, too, in this case. E.M. scheduled a massage with defendant. Although the

16

massage took place at defendant's house, the room in which the massage was performed appeared professional. It contained a massage table and pictures showing the human body, and there were certificates on the walls attesting to defendant's training as a massage therapist. As in *Icke*, the context in which the touching occurred was sufficient to communicate a professional purpose of *all* of the touching defendant engaged in while E.M. lay on the massage table.

Defendant argues the massage was not "purely professional," and was instead "arranged at least partially as a means, on [E.M.'s] part, of establishing romantic or physical contact following the death of her husband." This argument borders on the ludicrous, and, tellingly, is accompanied by no citation to the record. "When an appellant's brief makes no reference to the pages of the record where a point can be found, an appellate court need not search through the record in an effort to discover the point purportedly made. [Citations.] We can simply deem the contention to lack foundation and, thus, to be forfeited." (*In re S.C.* (2006) 138 Cal.App.4th 396, 406-407.) We thus deem the argument forfeited, and even if we did not, we would reject it. E.M. testified that a friend referred her to defendant for a massage to help her relax and relieve her stress. Although the friend (or perhaps E.M. herself) referred to defendant as a "healer," she did not suggest the healing had a sexual component. Simply put, E.M. scheduled a massage, not a sexual or romantic liaison.

Defendant argues that, in addition to proving he misrepresented the nature of the sexual penetration, the prosecution also had to prove E.M. "was *deceived* by this misrepresentation and thus unconscious of the sexually motivated nature of the act." (*Icke, supra*, 9 Cal.App.5th at p. 146, italics added.) Defendant argues there is insufficient evidence that E.M. actually believed the acts had a professional purpose. (*Id.* at p. 148.) Not so. E.M. testified she was "confused" when defendant put his finger in her vagina, and she didn't know whether it was "right or wrong." Defendant kept telling her he was "healing" her and this would "help." She explained, "one side of me wanted

17

to get better, and another side of me felt like it was incorrect." As the *Icke* court noted, "We . . . reject any suggestion that the victim's unconsciousness of the sexual nature of the act must be absolute. Confusion, rather than clarity, is not surprising when a professional unexpectedly touches the sexual parts of the victim's body during purported professional treatment. Confusion or doubt about the purpose of the touching does not preclude a conviction." (*Id.* at p. 149.) So, too, in this case. Moreover, E.M. scheduled a second massage after defendant put his fingers in her vagina during the first massage because she "felt like he was trying to heal" her. Her willingness to return for another massage suggests she was not fully cognizant of the essential characteristics of the act. (See *Pham, supra*, 180 Cal.App.4th at p. 929.) E.M.'s testimony is sufficient to prove she believed the penetration served a professional purpose, and she was thus not aware of the essential characteristics of the act.

### C. Counts 14 and 20—D.E. and C.E.

In counts 14 (involving D.E.) and 20 (involving C.E.), defendant was convicted of sexual battery (i.e., touching the intimate part of another person against their will for purposes of sexual arousal, gratification, or abuse) while the victim was "unlawfully restrained." (§ 243.4, subd. (a).)[5] He argues there was insufficient evidence of restraint, lawful or otherwise, to support either count. We disagree. Instead, we find when the evidence in this case is viewed in the light most favorable to the prosecution, it is sufficient to establish restraint, although, as discussed in Section II, below, we find the evidence would also support a contrary finding, and the jury thus should have been instructed on a lesser included offense that lacks the element of restraint—namely,

---

[5] Defendant was also convicted of one count (count 15) of misdemeanor sexual battery involving D.E., and two counts (counts 21 & 22) of sexual battery by misrepresentation of professional purpose involving C.E., and he does not challenge his conviction on these counts.

18

misdemeanor sexual battery.

       *1.     Relevant facts*

           *a.  D.E.*

D.E. made an appointment at the Wellness Center in June 2020 to get a wood therapy massage to flatten her stomach. She testified the office "seemed really professional," and there were other people in the waiting area. After she checked in and filled out some paperwork, defendant came out and took her back to the massage room.

D.E. was wearing a T-shirt and leggings, and she kept her clothes on throughout the session. Defendant initially instructed her to lay down on the massage table on her back and roll her shirt up to underneath her breasts, and she did so. Defendant put some cream on her stomach and began massaging it with a wooden device. Defendant told D.E. to roll her leggings down to underneath her belly button, and she did. Defendant continued massaging her stomach. He told her to roll her leggings down farther, and she initially hesitated. Ultimately, however, after he kept saying the treatment would work better, she allowed him to roll her leggings lower. He rolled them "really low," but her "private part" was not exposed. He continued massaging D.E.'s stomach area.

Defendant then told D.E. to turn to her left side so he could massage her thighs. D.E. told him she did not care about the fat in her thighs, just her stomach, but he said it was part of the wood therapy process, so she agreed. He turned her onto her left side and, while standing behind her, massaged her thigh with his left hand while massaging her stomach with his right hand. D.E. felt something hard, like an erect penis, pressing against her buttocks. She testified defendant then moved his right hand underneath her leggings and between her thighs and rubbed the outside of her vaginal lips for four to five seconds. She immediately knew this was not right and was not part of the therapy. She was scared. She realized the door was closed and she thought to herself "it's just me and him." She felt "really blank" and started crying. She turned onto her back. Defendant asked if she was okay, and she didn't respond. Defendant offered her his hand to help

19

her stand up, but she refused it and stood up on her own. He tried handing her his business card, but she did not take it. She left. The whole session lasted 10 to 15 minutes.

Defendant testified he did one wood therapy session with D.E. He remembered nothing specific about the session, but he testified he never touched D.E.'s vaginal area, and he never put his hands down her pants.

### b. C.E.

C.E. received two massages from defendant in 2013 at Heal the Body (his business located inside a shopping mall). She wanted a full-body massage because she was pregnant and feeling uncomfortable. Someone had recommended defendant to her.

C.E. testified the first massage was during the early stages of her pregnancy, in August of 2013. She testified the massage was "great" and defendant didn't cross any boundaries. She scheduled a second massage because she was having pregnancy pain in her back and wanted some relief.

C.E. was seven and a half months pregnant when she got the second massage. She went into the massage room, got undressed down to her bra and underwear, then got onto the massage table and covered herself with a sheet. She lay on her side. Defendant came in and massaged her back for a while, and that "was fine."

Defendant then had C.E. lie on her back so he could massage her legs. He positioned her foot in his groin or "zipper area"; C.E. moved it away, and he put it back. This happened three to five times. C.E. thought she felt defendant's penis when he positioned her foot in his groin, but she wasn't sure because her foot had never touched a penis before. She was confused, and thought, "what's going on?"

Defendant then began massaging her arms, and as he did so, he kept moving her arm so her hand brushed against his penis. C.E. was "concerned" and thought this "should not be occurring," but at the same time she thought maybe it was part of the massage.

20

Defendant then told her to take her bra off because it was in the way and she would enjoy the massage more if she had it off. She did so. She assumed he intended to massage below her collar bone, like he had done during the first massage. While standing behind her head, he removed the sheet and began massaging her breasts in a circular motion. C.E. thought that was "weird," but maybe part of the massage. She testified she did not want him touching her breasts, but was thinking she could not jump off the table because she was "hella pregnant," she was "super big" and moving "really slow," and she was concerned she might hurt herself or her baby. She was scared because no one else was around, and she thought if defendant was capable of this, she was "not sure what else he [was] capable of." C.E. asked defendant what the purpose of touching her breasts was, and he stuttered and said something about muscles getting tense during pregnancy. For her safety, she wanted to believe him. She was also trying not to react emotionally and to stay calm and let the massage "play out" so she could get home safely. She testified, "It was all about survival at that moment. I could pick to overreact and possibly get extremely hurt or I could choose to stay as calm as possible and just make it home safely."

The massage continued, and defendant went back to her legs. He massaged her inner thighs and then went underneath her underwear and touched her labia. At first C.E. thought it might have been an accident, and defendant's hand might have slipped because it had a lot of oil on it. When this happened "three times," however, she decided it was not an accident. She did not want to say anything because she was concerned about her safety and the safety of her baby, and she just wanted to make it home.

The massage ended, and C.E. paid defendant and left. She reported what had happened to the police shortly thereafter.

Defendant testified he never touched the lips of C.E.'s vagina, but that he did massage the lymph nodes in her groin area and the area around her breasts. He also testified his groin never made contact with C.E.'s hands.

21

2.    *Sufficient evidence of restraint supports the convictions in counts 14 and 20.*

Although section 243.4 does not define the term "unlawfully restrained," case law teaches that it can be found where "[d]efendant's conduct forced [the victim] to remain where she did not voluntarily wish to be." (*People v. Grant* (1992) 8 Cal.App.4th 1105, 1113 (*Grant*).) Case law also teaches that although restraint can be physical (for example, grabbing the victim or holding her down), physical restraint is not required. (*Id.* at pp. 1111-1112.) Finally, case law teaches "a person is unlawfully restrained when his or her liberty is being controlled by words, acts or authority of the perpetrator aimed at depriving the person's liberty, and such restriction is against the person's will . . . . The 'unlawful restraint required for violation of section 243.4 is something more than the exertion of physical effort required to commit the prohibited sexual act.' " (*People v. Arnold* (1992) 6 Cal.App.4th 18, 28.) CALCRIM No. 935, which the jury was given in this case, repeats this last definition almost verbatim and instructs, "Someone is unlawfully restrained when his or her liberty is controlled by words, acts, or authority of another and the restraint is against his or her will. Unlawful restraint requires more than just the physical force necessary to accomplish the sexual touching." Viewing the evidence in the light most favorable to the prosecution, and applying the above definition to that evidence, we conclude there is sufficient evidence of restraint to support the jury's verdict on both counts.

We first explain why we reject defendant's argument that D.E. and C.E. "were adults who *voluntarily agreed to a therapeutic massage*. They could have gotten up and left at any time without adverse consequences; nothing was said or done to prevent them." (Italics added.) To the extent defendant argues D.E. and C.E. agreed or consented to the exertion of physical restraint that is concomitant with a therapeutic massage, this may be true, but it is clear the women did *not* agree to being sexually assaulted during the course of that massage. On this point, we find *People v Alford*

22

(1991) 235 Cal.App.3d 799 is instructive. In *Alford*, the defendant was a correctional officer charged with transporting female inmates who were waist-chained and handcuffed during the transport. On two different occasions, the defendant fondled an inmate's breasts with his hands and his mouth and placed the inmate's hand on his crotch. The defendant was convicted of three counts of sexual battery by restraint. On appeal, he argued there was insufficient evidence to support the convictions because the inmates had been placed in restraints for a lawful purpose and they were thus not *unlawfully* restrained. (*Id*. at p. 802.) The appellate court characterized this argument as "utter[ly] absurd[]," and held, "it is recognized that what is lawfully begun can become unlawful when for example, it exceeds the bounds of reasonableness, when the conduct which would otherwise be lawful is engaged in for an improper purpose or when, as in this case, *the original lawful purpose is replaced with or supplemented by an unlawful purpose*." (*Id.* at pp. 803-804, italics added.) So, too, in this case. Once defendant took advantage of the victims' consent to a therapeutic massage by touching their genitals, he exceeded the scope of their consent and engaged in unlawful conduct.

To the extent defendant argues he did not by his words, acts, or authority control D.E. and C.E.'s liberty or force them to remain where they did not wish to be, we conclude a reasonable jury could find otherwise and substantial evidence exists to support that finding.

As noted above, physical restraint is not required, but it *is* sufficient, and there was evidence of physical restraint in this case. For example, D.E. testified that, when the inappropriate touching occurred, she was on her left side and defendant was standing behind her close enough that she felt what she thought was his erect penis pressing against her backside. She also testified defendant had his right hand on her stomach and his left hand on her thigh when he reached underneath her leggings and touched the outside of her vagina. D.E. was thus, in a very real sense, physically pinned to the massage table by defendant pressing his body against her backside and reaching over her

23

and placing one hand on her thigh and one hand on her stomach. Viewing the evidence in the light most favorable to the prosecution, a reasonable jury could find defendant physically restrained D.E. and touched her vagina while she was restrained.

As for C.E., she was seven and a half months pregnant, "super big" and moving "really slow," and afraid she might hurt herself or her unborn baby if she jumped off the table and ran. Although defendant did not create C.E.'s pregnancy or the physical limitations it caused, he took advantage of them. Once again, we find *Alford* is instructive. The defendant in that case, in addition to arguing the inmates were lawfully restrained, also argued one of the inmates was not restrained by him at all but rather by another correctional officer and there was no evidence the other officer was the defendant's accomplice. (*People v. Alford, supra*, 235 Cal.App.3d at p. 803, fn. 4.) The court rejected this argument because, whether or not the defendant had restrained the inmate, he "[took] advantage of the fact of the inmate's lawful restraints and engage[d] in acts for an improper purpose, such as sexual arousal or gratification." (*Id*. at p. 804.) So, too, in this case. Defendant took advantage of the fact that C.E.'s advanced state of pregnancy restrained her movement and he then proceeded to touch her in an inappropriate manner and for an improper purpose. Additionally, defendant repeatedly placed C.E.'s foot in his groin and her hand against his penis despite her attempts to resist. Viewing the evidence in the light most favorable to the prosecution, a reasonable jury could find that because defendant manipulated C.E.'s body while she was lying naked on a massage table in a room with the door closed and had difficulty moving because of her advanced state of pregnancy, she was restrained within the meaning of section 243.4, subdivision (a).

Defendant's conduct and actions also created a situation that caused D.E. and C.E. to experience the common reaction to sexual assault described in *Iniguez*—namely, freezing in fear. (*Iniguez, supra*, 7 Cal.4th at p. 855.) D.E. testified that when defendant touched her labia, she thought, "I'm just going to stand up and . . . run or scream," but

she did not. Instead, she went "blank" and got "quiet." She was "scared" because she realized the door was closed, and "it's just me and him." C.E. testified that when defendant began touching her breasts and her labia, she tried hard not to "freak out." She realized she was alone in the room with defendant, and "If he is capable of this, I'm not sure what else he is capable of." She explained, "It was all about survival at that moment. I could pick to overreact and possibly get extremely hurt or I could choose to stay as calm as possible and just make it home safely." Given the scenario both women found themselves in, which was "instigated and choreographed by defendant," we find their response was reasonable. (*Id.* at p. 859.) Defendant carefully orchestrated a series of events designed to provide him access to these women's bodies under circumstances where they were unable or at least less likely to object when he touched them inappropriately. When they froze in fear in response, his scheme was successful. As the *Iniguez* court held, "There is no requirement that the victim say, 'I am afraid, please stop,' *when it is the defendant who has created the circumstances that have so paralyzed the victim in fear and thereby submission*." (*Ibid.*, italics added.) Viewing the evidence in the light most favorable to the prosecution, a reasonable jury could find that defendant's conduct and actions created a situation where both women froze in fear and felt compelled "to remain where [they] did not voluntarily wish to be," and that he thus restrained them within the meaning of section 243.4, subdivision (a). (*Grant, supra*, 8 Cal.App.4th at p. 1113.)

Although it is factually distinguishable, we find *Grant, supra*, 8 Cal.App.4th 1105 provides further support for our conclusion that the evidence supports defendant's conviction on counts 14 and 20. The defendant in *Grant* approached two teenagers (Shannon and Efren) who were kissing in a car. He told them he worked for the property owner and they did not belong there. He grabbed Shannon's arm, removed her from the car, then released her arm. He told her she would get in trouble if she did not cooperate, and he might call the police. He reached inside her shirt and touched her breast and put

25

his hands down her pants. (Id. at p. 1108.) Shannon felt she was unable to do anything because of the defendant's "official capacity." (Ibid.) The defendant eventually left when another vehicle approached. (Ibid.)

In upholding the defendant's conviction for sexual battery while the victim was unlawfully restrained, the court noted the defendant presented himself as an authority figure, grabbed Shannon's arm while removing her from the car, and impliedly threatened to call the police. The court found, "Clearly Shannon's liberty was being controlled by defendant's words, acts and authority. Defendant's conduct forced Shannon to remain where she did not voluntarily wish to be." (Grant, supra, 8 Cal.App.4th at p. 1113.) As relevant here, it also noted, "There are many situations where one is compelled, i.e., forced, to do something against one's will but the compulsion does not involve personal violence or threats of personal violence. This is especially true when the person involved in the compulsion is an authority figure or posing as a person in authority. The force is a psychological force compelling the victim to comply with the orders of the authority figure." (Id. at p. 1112.)

Grant thus teaches that restraint can be psychological, particularly when asserted by an authority figure. Here, defendant held himself out as a type of authority figure—namely, an expert in massage therapy—who D.E. and C.E. could trust to perform a legitimate and professional massage. Relying on that authority and trust, D.E. and C.E. gave defendant access to intimate parts of their bodies. They also agreed to be alone with him, in a room with the door closed, either entirely or partially undressed. Defendant violated both his position of authority and the women's trust in that authority by touching them inappropriately. When he did so, they froze in fear and shock, and as they both described, were psychologically compelled by defendant's actions to "remain where [they] did not voluntarily wish to be," which is the essence of restraint. (Grant, supra, 8 Cal.App.4th at p. 1113.) The evidence supports the jury's finding that defendant committed sexual battery while D.E. and C.E. were restrained within the meaning of

26

section 243.4, subdivision (a).

Defendant's few arguments to the contrary are unpersuasive. He argues the "physical setting did not amount to restraint" because the massages occurred during business hours in an unlocked room located in a commercial office building or a mall. We disagree. As noted above, both women testified they were afraid, in part, because they were alone with defendant in a room with the door closed and they thought no one else was in the immediate vicinity. Just as " ' " ' "it is not necessary that there be confinement in a jail or prison" ' " ' " to support finding of restraint (*People v. Arnold, supra*, 6 Cal.App.4th at p. 27), we find it unnecessary that the door to the room be locked or that the crime occur after business hours.

Finally, defendant returns several times to the statement in *People v. Alford, supra*, 235 Cal.App.3d at page 803, that section 243.4, subdivision (a) was enacted "to provide appropriate punishment for sexually abusive conduct which falls short of [attempted rape] but which is nonetheless 'physically traumatic and psychologically terrifying.' " He argues that nothing he did induced either physical trauma or psychological terror in D.E. and C.E. We disagree. Both women testified how scared and traumatized they were. D.E. testified she was so scared she "blacked out," or went "blank," started crying, and was "in trauma at the moment."[6] C.E. testified she was "scared," trying hard not to "freak out," worried defendant might hurt her or her unborn baby, and in "survival" mode. During what both women thought was a professional massage, defendant touched them in ways no professional massage therapist should touch a client. Their fear and

---

[6] Defendant argues D.E.'s trauma was caused by "some past episode," and not by anything he did. We again disagree. The only evidence he cites to support his argument is D.E.'s testimony that, when he touched her vagina, "I was just in trauma at the moment. I think of what I went through when I was smaller and everything came back." Even if we interpret this snippet of testimony to mean that defendant's actions brought back memories of past trauma, that does not diminish the fact that defendant's actions were also causing current trauma.

27

trauma were entirely reasonable.

### D. Counts 30 through 35—Victim Y.G.

Defendant was convicted of six counts (30 through 35) of sexual battery by fraudulent representation of professional purpose (§ 243.4, subd. (c)) involving victim Y.G. Y.G. received three massages from defendant, and counts 30 through 35 concerned the second massage.[7] In his opening brief, defendant argues Y.G. described only one inappropriate touching during the second massage, and that five of the six counts are thus not supported by the evidence and must be reversed. Defendant is incorrect.

Y.G. testified that, during the second massage, defendant pushed her underwear aside and touched her vaginal lips six or seven times. On cross-examination, she reiterated that, during the second massage, defendant touched the outer portion of her labia six to eight times. The People point to this testimony in the respondent's brief. Defendant acknowledges in his reply brief, "Respondent *correctly* argues that the five touchings described in counts 31, 32, 33, 34, and 35 were attributed to the second massage appointment," and he proffers no further argument about these counts. Y.G.'s testimony that defendant touched her vagina six or more times is sufficient to support his conviction of sexual battery on counts 30 through 35. (See *People v. Harrison* (1989) 48 Cal.3d 321, 329 [separate violation completed each time the defendant touched the victim's vagina].)

## II

## Lesser Included Offenses

Defendant argues the trial court committed reversible error by failing to instruct

---

[7] There were a total of 10 counts (29 through 38) involving Y.G. Count 38 was dismissed before the jury began deliberating; defendant was convicted on counts 30 through 35 and 37, and he does not challenge his conviction on counts 30 and 37; and the jury reached no verdict on counts 29 and 36.

the jury on lesser included offenses on counts 3, 4, 14, and 20.

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] . . . ." [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], . . . . [Citations.] The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given.' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154-155, disapproved on other grounds in *People v. Schuller* (2023) ___Cal.5th ___ [2023 Cal. Lexis 4520, *37, fn. 7].)

"Two tests are used to determine 'whether a crime is a lesser included offense of a greater offense: the elements test and the accusatory pleading test. [Citation.] Either of these tests triggers the trial court's duty to instruct on lesser included offenses.' " (*People v. Bradley* (2021) 65 Cal.App.5th 1022, 1037.) "Under the elements test, an uncharged offense is included in a greater charged offense if the statutory elements of the greater offense include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Ngo* (2014) 225 Cal.App.4th 126, 156.) Under the accusatory pleading test, " 'if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former.' " (*People v. Shockley* (2013) 58 Cal.4th 400, 404.) "The evidence adduced at trial is not to be considered in determining whether one offense necessarily is included within another." (*People v. Cheaves* (2003) 113 Cal.App.4th 445, 454.)

"We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense." (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.) Any error in failing to instruct on a lesser included offense is

subject to the harmless error test set forth in *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 199; *People v. Breverman, supra*, 19 Cal.4th at pp. 165, 178.) Under the *Watson* test, reversal is only required if it appears "reasonably probable" the defendant would have obtained a more favorable outcome had the jury been properly instructed. (*Watson*, at p. 836.)

### A.     Counts 3 and 4—Victim R.B.

Defendant was convicted on counts 3 and 4 of sexual penetration by force, duress, or fear (§ 289, subd. (a)). He argues the trial court had a duty to instruct the jury on misdemeanor sexual battery (§ 243.4, subd. (e)) as a lesser included offense. We disagree, because sexual battery is not a lesser included offense of sexual penetration under either the elements test or the accusatory pleading test.

The statutory elements of sexual penetration by force are (1) sexual penetration, (2) accomplished against the victim's will, (3) by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury. (§ 289, subd. (a)(1)(A).) Sexual penetration means (1) penetration, however slight, of the victim's genital or anal opening, (2) for the purpose of sexual arousal, gratification, or abuse, (3) "by a foreign object, substance, instrument, or device, or by any unknown object." (§ 289, subd. (k)(1).) A "foreign object," et cetera, includes "any part of the body, except a sexual organ." (§ 289, subd. (k)(2).) A foreign object includes the defendant's finger. (See *People v. Wilcox* (1986) 177 Cal.App.3d 715, 717.)

The statutory elements of misdemeanor sexual battery are (1) touching an intimate part of another person, (2) against the will of the other person, (3) for the purpose of sexual arouse, gratification, or abuse. (§ 243.4, subd. (a).) Touching means "physical contact with the skin of another person," either directly or through the person's clothing. (§ 243.4, subd. (f).) Intimate part means the sexual organ, anus, groin, buttocks, or breasts. (§ 243.4, subd. (g)(1).)

In *People v. Ortega* (2015) 240 Cal.App.4th 956, the court held sexual battery is

not a lesser included offense of sexual penetration under the statutory elements test, because sexual battery requires physical contact between the defendant's body and the victim's body, while sexual penetration does not because it can be committed where the defendant touches the victim's body with a foreign object. It is thus "possible to commit the greater [offense] without committing the lesser (e.g., where penetration is accomplished by means other than a part of the perpetrator's body)." (*Id*. at p. 967.) We agree.

That leaves the accusatory pleading test. Under that test, an offense is necessarily included in the charged offense "if the charging allegations of the accusatory pleading include language describing the offense in such a way that if committed as specified the lesser offense is necessarily committed." (*People v. Muniz* (1989) 213 Cal.App.3d 1508, 1516, disapproved on other grounds in *People v. Escobar* (1992) 3 Cal.4th 740, 749.) Thus, for example, if the accusatory pleading had identified the defendant's finger as the foreign object that caused the sexual penetration, then it would contain all the elements of sexual battery, and sexual battery would be a lesser included offense. (See *People v. Ortega, supra*, 240 Cal.App.4th at p. 968.) Here, however, the accusatory pleading merely tracks the language of the statute and alleges defendant "did willfully and unlawfully cause the penetration, however slight, of the genital opening of the victim, to wit, R.B., when the act of penetration was accomplished against the victim's will by means of force, violence, duress, menace and fear of immediate and unlawful bodily injury to the victim." "Where the accusatory pleading, as in this case, tracks the statutory language rather than reciting factual details of the offense, 'only the statutory elements test is relevant in determining if an uncharged crime is a lesser included offense of that charged.' " (*People v. Braslaw* (2015) 233 Cal.App.4th 1239, 1247.) We must thus rely on the statutory elements test to determine whether sexual battery is a lesser included offense of sexual penetration, and, as just noted, we find it is not.

Defendant urges us to apply the expanded accusatory pleading test announced in

31

*People v. Ortega, supra*, 240 Cal.App.4th 956, and to also consider the evidence that was presented to the grand jury in this case when determining whether sexual battery is a lesser included offense of sexual penetration in this case. We decline to do so. Instead, we agree with those courts that have held *Ortega* was wrongly decided, including *People v. Alvarez* (2019) 32 Cal.App.5th 781, *People v. Munoz* (2019) 31 Cal.App.5th 143, and *People v. Macias* (2018) 26 Cal.App.5th 957. As all of these cases noted, our Supreme Court has instructed that "we consider *only* the pleading" when applying the accusatory pleading test. (*People v. Montoya* (2004) 33 Cal.4th 1031, 1036.) We are bound by this precedent. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

The trial court thus did not err in failing to instruct on sexual battery as a lesser included offense of sexual penetration.

### B.     Counts 14 and 20—Victims D.E. and C.E.

Defendant was convicted on counts 14 and 20 of sexual battery while the victim was unlawfully restrained (§ 243.4, subd (a)). Utilizing CALCRIM No. 935, the jury was instructed that in order to convict on these counts, the prosecution had to prove: (1) defendant unlawfully restrained the victim; (2) while the victim was restrained, defendant touched an intimate part of the victim (which includes a female's breasts, sexual organ or buttocks); (3) the touching was done against the victim's will; and (4) the touching was done for the purpose of sexual arousal, sexual gratification or sexual abuse. (CALCRIM No. 935.) The jury was also instructed the victim is "unlawfully restrained" if "her liberty is controlled by words, acts, or authority of another." (*Ibid*.) Defendant argues that the evidence of restraint in this case was at least questionable, and the trial court thus had a duty to instruct on a lesser included offense that lacked the element of restraint— namely, misdemeanor sexual battery (§ 243.4, subd. (e)).[8] The People acknowledge that

---

[8]     The elements of misdemeanor sexual battery are (1) the defendant touched the intimate part of another, (2) against the person's will, and (3) the touching was done for

misdemeanor sexual battery is a lesser included offense of sexual battery by restraint, and we agree. (See *People v. King* (2010) 183 Cal.App.4th 1281, 1319 ["Misdemeanor sexual battery is a lesser included offense of sexual battery by restraint"].) The People nonetheless argue the trial court did not err in failing to instruct on misdemeanor sexual battery because there was not substantial evidence to support such an instruction; and even if the trial court did err, reversal is not required because the error was both harmless and invited. Defendant has the more persuasive argument.

As our Supreme Court has explained, "a trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*People v. Breverman, supra*, 19 Cal.4th at p. 162.) "[T]he existence of 'any evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." (*Ibid.*, italics omitted.)

For the reasons explained above, we conclude a reasonable jury could find defendant committed sexual battery while D.E. and C.E. were restrained. We also conclude, however, that the issue is close and that the evidence did not compel such a finding and could also support a contrary one. We also note that the issue of whether there was sufficient evidence to support defendant's conviction of sexual battery by restraint is different than the issue of whether the jury should have received an instruction on the lesser included offense of misdemeanor sexual battery, which lacks the unlawful

---

the purpose of sexual arousal, sexual gratification, or sexual abuse. (CALCRIM No. 938.)

restraint element (§ 243.4, subd. (d)).  This is particularly true where, as here, C.E. testified she did not leave as soon as the second massage ended, and she asked defendant to work on her arm some more because there was a knot in it.  She also admitted on cross-examination that she never told the police she was afraid during the second massage.  Moreover, D.E. agreed on cross-examination that defendant was not holding her down and never told her she couldn't leave.  Given the totality of the evidence, a reasonable juror could have found defendant guilty of misdemeanor sexual battery but not of sexual battery while the victim was restrained.  The trial court thus erred in not instructing the jury on misdemeanor sexual battery as a lesser included offense.

We also find the error was not harmless because it is reasonably probable that if the jury had been properly instructed, at least one juror would have found defendant guilty of misdemeanor sexual battery rather than sexual battery while the victim is restrained, and "a hung jury is a more favorable result than a guilty verdict." (*People v. Soojian* (2010) 190 Cal.App.4th 491, 521; see also *People v. Walker* (2015) 237 Cal.App.4th 111, 118 [reversal warranted if it is reasonably probable at least one juror would have convicted of lesser offense rather than greater].)

Finally, we find the error was not invited.  "[A] defendant may not invoke a trial court's failure to instruct on a lesser included offense as a basis on which to reverse a conviction when, for tactical reasons, the defendant persuades a trial court not to instruct on a lesser included offense supported by the evidence.  [Citations.]  In that situation, the doctrine of invited error bars the defendant from challenging on appeal the trial court's failure to give the instruction." (*People v. Barton* (1995) 12 Cal.4th 186, 198.)  "Invited error will be found, however, only if counsel expresses a deliberate tactical purpose in resisting or acceding to the complained-of instruction." (*People v. Souza* (2012) 54 Cal.4th 90, 114.)  It is not enough that we "can infer from the record as a whole that defense counsel made a deliberate tactical decision not to request instructions on necessarily included offenses." (*People v. Wickersham* (1982) 32 Cal.3d 307, 333.)

Here, the People point to several statements from defense counsel that they contend serve as objections on tactical grounds to the trial court instructing on misdemeanor sexual battery as a lesser included offense to counts 14 and 20.  We disagree.

The first two statements were made during a discussion of the prosecutor's midtrial motion to amend the accusatory pleading to conform to proof.  Among other things, the prosecutor sought to change several sexual penetration counts to sexual battery counts, and the motion was based, in part, on the rule that such an amendment may be allowed where the new charges are lesser included offenses of the original charges.  While discussing this motion, defense counsel stated he objected "to the giving lesser included instructions of the 243," and "to the changes to Count 20 and lessers." The record is not clear whether defense counsel was objecting to the motion to amend, or to giving lesser included offense instructions.

Two other statements concerned the sexual penetration counts.  At one point, the prosecutor asked the trial court whether it was "going to give lessers" regarding "the remaining 289's," and the court asked, "So that would mean that for each 289(d) we would give a 243.4(c), and for all 289(a)(1)(A)'s we give a 243.4(a); is that correct?" The prosecutor responded, "Right," and defense counsel stated, "I would object to giving of the lessers."  Later, the trial court stated it would give lesser included offense instructions for all the section 289 counts, and defense counsel responded, "I object to the giving of lessers.  I don't think it's authorized but I would submit on that."  Defense counsel's objection to giving lesser included offense instructions on the section 289 counts (sexual penetration), however, did not invite any error regarding the failure to give lesser included offense instructions on counts 14 and 20, which alleged violations of section 243.4 (sexual battery).

Defense counsel's last comment about lesser included offense instructions occurred when the parties and the trial court were discussing the jury instruction for sexual battery by restraint, CALCRIM No. 935, and *not* when they were discussing the

jury instruction on lesser included offenses, CALCRIM No. 3517. The court asked the parties whether they had any comments about CALCRIM No. 935. The prosecutor stated, "Yes, I think Count 14 is missing D.E.'s initials," and defense counsel stated, "I agree it's missing. I don't agree that the Court should allow the lesser." We find this statement is too unclear to show defense counsel had a tactical reason for objecting to instructing the jury on misdemeanor sexual battery as a lesser included offense to counts 14 and 20.

We thus find defendant's conviction on counts 14 and 20 for sexual battery while the victim was restrained cannot stand because of the failure to instruct on misdemeanor sexual battery as a lesser included offense. "It does not necessarily follow, however, that the judgment must be unconditionally reversed." (*People v. Wimer* (2022) 74 Cal.App.5th 113, 136.) Instead, "provided the evidence supports a conviction of the lesser offense," we may "modify the judgment" accordingly. (*People v. Matian* (1995) 35 Cal.App.4th 480, 488.) Defendant tacitly acknowledges the evidence supports a conviction on the lesser offense when he states, "Misdemeanor [sexual] battery was a readily available alternative which would have been adopted by this jury" had it been properly instructed, and we agree. The evidence that defendant touched an intimate part of D.E. and C.E. against their will and for purposes of sexual arousal, gratification, or abuse was overwhelming. "Under such circumstances, the prosecution has the option to retry [defendant] or to accept modification of the judgment to reflect a conviction for the lesser included offense." (*Wimer*, at p. 136; see also *People v. Kelly* (1992) 1 Cal.4th 495, 528 ["When a greater offense must be reversed, but a lesser included offense could be affirmed, we give the prosecutor the option of retrying the greater offense, or accepting a reduction to the lesser offense"].) We will give the prosecutor those two options.

# III

## CALCRIM No. 1191B

Thirty-five counts were submitted to the jury, all alleging various sex offenses. The jury was given CALCRIM No. 1191B regarding evidence of charged sex offenses, which instructs as follows: "The People presented evidence that the defendant committed the crimes of sexual battery, sexual penetration with a foreign object by force, fear, duress, or threats, and sexual penetration with a foreign object of an unconscious person. [¶] If the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the other sex offenses charged in this case. [¶] If you find that the defendant committed one or more of these crimes, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of another crime. The People must still prove each charge and allegation beyond a reasonable doubt."

Defendant argues CALCRIM No. 1191B is an incomplete statement of the law because it fails to instruct jurors on their use of those charged sex offenses on which no verdict was reached, and, more particularly, it fails to instruct on the standard of proof and unanimity. We disagree.

Evidence Code section 1101 provides that character evidence is generally inadmissible to prove a person's conduct on a particular occasion. This type of evidence is frequently referred to as propensity evidence, i.e., evidence of someone's propensity to engage in a particular type of conduct. Evidence Code section 1108 creates an exception to the general rule against the admissibility of propensity evidence, and provides, "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible

37

by Section 1101." (Evid. Code, § 1108, subd. (a).) In *People v. Villatoro* (2012) 54 Cal.4th 1152, our Supreme Court held that Evidence Code section 1108 applies to evidence of both *charged* sex offenses and *uncharged* sex offenses. It also approved a jury instruction on charged sex offenses that is similar to CALCRIM No. 1191B, and that "told the jury that all [charged] offenses must be proven beyond a reasonable doubt, even those used to draw an inference of propensity." (*Villatoro*, at p. 1168; see *id*. at p. 1167.) CALCRIM No. 1191B was adopted following *Villatoro*, and was subsequently upheld in *People v. Meneses* (2019) 41 Cal.App.5th 63, 68.

Defendant has two complaints about the use of CALCRIM No. 1191B in cases like this one, where multiple counts are charged and there is a likelihood the jury will be unable to reach a verdict on some counts. First, he argues CALCRIM No. 1191B fails to inform jurors on the standard of proof to be applied on the "no-verdict counts." In his view, the instruction should have informed "the not-guilty jurors . . . what standard of proof was to guide them," because without such an instruction, the not-guilty jurors "could very well have considered the other crimes evidence for propensity, merely because they had a suspicion of the defendant's guilt on the no-verdict counts." His concern is thus that a juror who did not find defendant guilty beyond a reasonable doubt on a particular count, but who nonetheless had a suspicion that he committed that count, might consider that count as evidence that he had a propensity to commit sex offenses and was likely to have committed the other sex offenses in this case. We find defendant's concern is unfounded because CALCRIM No. 1191B clearly instructs the jury it may only consider other charged sex offenses as propensity evidence "[i]f the People have proved beyond a reasonable doubt that the defendant committed one or more of these crimes."

Defendant also appears to contend the jury should have been instructed that the no-verdict counts could only be considered as propensity evidence if it found those

counts were established by a preponderance of the evidence.[9]  As noted above, however, in *Villatoro*, our Supreme Court upheld a jury instruction that "told the jury that all [charged] offenses must be proven beyond a reasonable doubt, even those used to draw an inference of propensity." (*People v. Villatoro, supra*, 54 Cal.4th at p. 1168.)  Several years later, in *People v. Cruz* (2016) 2 Cal.App.5th 1178, the court noted, "*Villatoro* did not expressly hold that currently charged offenses must be proved beyond a reasonable doubt before they can be used to show a propensity under Evidence Code section 1108, but it strongly implied that rule." (*Id*. at p. 1186.)  The *Cruz* court then explained, "In our view, a jury instruction explaining the use of currently charged offenses to show propensity under Evidence Code section 1108 must resemble the instruction used in *Villatoro* in specifying that a currently charged offense must be proved beyond a reasonable doubt before it can be used as propensity evidence in support of another currently charged offense." (*Ibid*.)  It also held it was "erroneous" and "incorrect" to use an instruction (like the one defendant urges here) that told the jury it could infer a propensity to commit sex offenses if it found by a preponderance of the evidence the defendant committed other charged sex offenses. (*Id*. at pp. 1184, 1186.)  We agree, and hold CALCRIM No. 1191B correctly instructs that the standard of proof is beyond a reasonable doubt rather than preponderance of the evidence.  Moreover, even if we were to find this was error (and we do not), it was harmless because it *helped* defendant by raising the standard of proof.

Defendant's second complaint is that CALCRIM No. 1191B fails to instruct the jury that it must *unanimously* find he committed a charged sex offense before considering that offense as propensity evidence.  In other words, before any juror may use other charged sex offenses as propensity evidence, all 12 jurors must agree that defendant

---

[9]     This is the standard of proof that applies when evidence of *uncharged* sex offenses is introduced.  (See *People v. Reliford* (2003) 29 Cal.4th 1007, 1012.)

committed that offense. He cites no law requiring such unanimity, and we are aware of none.

Although it arose in a different context, we find *People v. Ghent* (1987) 43 Cal.3d 739 is instructive. *Ghent* was a death penalty case, and one of the things the jury could consider when deciding whether to impose the death penalty or life in prison was other uncharged criminal activity by the defendant. The jury was instructed it had to unanimously agree on the penalty to impose. (*Id*. at p. 773.) The defendant argued the jury should also have been instructed "that its finding of uncharged criminal activity must be unanimous." (*Ibid*.) Our Supreme Court disagreed, and noted, "Any such [unanimity] requirement would immerse the jurors in lengthy and complicated discussions of matters wholly collateral to the penalty determination which confronts them. Moreover, *we see nothing improper in permitting each juror individually to decide whether uncharged criminal activity has been proven beyond a reasonable doubt and, if so, what weight that activity should be given in deciding the penalty*." (*Id.* at pp. 773-774, italics added.) So, too, in this case. We see nothing improper in permitting each juror individually to decide whether other charged sex offenses were proven beyond a reasonable doubt and, if so, to consider whether this showed defendant had a propensity to commit sex offenses.

## IV

## Prosecutorial Misconduct

Defendant argues a small portion of the prosecutor's closing argument misstated the law, and that this error requires reversal. We disagree.

It is considered error or "misconduct" for the prosecutor "to misstate the law to the jury, and bad faith is not required. [Citation.] But a prosecutor is allowed to vigorously argue the case and is afforded 'significant leeway' in discussing the facts and the law in closing argument." (*People v. Azcona* (2020) 58 Cal.App.5th 504, 516.) Even if the prosecutor makes one statement that "when viewed in isolation, [does] misstate the law," there is no error if, "in the context of the entire argument and jury instructions, it was not

40

reasonably likely the jury understood or applied the statement in an improper or erroneous manner." (*People v. Meneses, supra*, 41 Cal.App.5th at p. 66.)

The alleged error in this case had to do with the prosecutor's argument regarding duress, which was relevant to the counts alleging sexual penetration by means of force, duress, or fear. The only portion of the prosecutor's closing argument that defendant cites to support his claim of error is this: "What's this duress mean[?] Well, the jury instruction tells us **duress is a direct or implied threat of force, violence, danger or hardship that's enough to cause a reasonable person of ordinary sensitivity to do or submit to something that they would not otherwise submit to. [¶] When you decide whether the act was accomplished by duress, consider all of the circumstances, including age of the other person and their relationship to the defendant.** *That's one of those reasons I asked . . . all the questions about what's your height? What's your weight? How old were you? What was* [defendant's] *age in relation to you?* That all plays into duress. What was their relationship? How do they know each other?" (Italics and bolding added.) The bolded portion of this statement is a near verbatim quote from the relevant jury instruction on duress—CALCRIM No. 1045. Defendant does not object to this portion of the statement, and he does not object to CALCRIM No. 1045 or suggest it misstates the law.[10] He does, however, object to the italicized portion of the statement, and he argues it misstates the law by effectively telling the jury that it could find duress based *solely* on a weight, height, and age differential between defendant and the victim, or the fact that defendant was larger than the victim. We disagree.

The law is clear that "[d]uress can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes."

---

[10] He states it "was sufficiently vague to permit a misinterpretation [of] the prosecutor's argument." As explained herein, we find the jury would not have interpreted the prosecutor's argument in the way defendant suggests.

41

(*People v. Senior, supra*, 3 Cal.App.4th at p. 775.) We thus find no error in the prosecutor accurately informing the jury it could consider the relatives ages and sizes of defendant and the victims.

Moreover, and contrary to defendant's suggestion, the prosecutor never suggested the jury could or should find duress based solely on the relative ages and sizes of defendant and the victims. The prosecutor began the challenged portion of her argument by accurately telling the jury it should "consider *all* of the circumstances" (italics added) when deciding whether an act was accomplished by duress. She then went on to list several such circumstances, including both the relative ages and sizes of defendant and the victims, and the relationship between defendant and the victims and how they knew each other. The prosecutor returned to the element of duress three more times during her closing argument, but never again mentioned the relative ages and sizes of defendant and the victims. Instead, she focused on the victims' testimony about what they were feeling and thinking when defendant touched them inappropriately, and the surrounding circumstances (i.e., they were alone in a room, half dressed, with the door closed). Viewing the prosecutor's closing argument as a whole, we find she never implied duress could be found based solely on the size differential between defendant and the victims.

## V

### Sentencing

Defendant was sentenced to the upper term of eight years on count 11 (sexual penetration of E.M. by misrepresentation of professional purpose). He argues that imposition of the upper term sentence violates a recent amendment to section 1170 that took effect after he was sentenced, and that the matter must be remanded for resentencing in light of the amendment. We agree.

At the time defendant was sentenced, section 1170 provided, "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court." (Former

42

§ 1170, subd. (b).)  Effective January 1, 2022, two weeks after defendant was sentenced, this provision was amended "to limit the sentencing discretion of trial courts." (*People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1108 (*Zabelle*).)  As amended, section 1170 now requires the court to "order imposition of a sentence not to exceed the middle term" (§ 1170, subd. (b)(1)) *unless* "there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."[11]  (§ 1170, subd. (b)(2).)  The People concede these amendments are retroactive and apply to defendant's case, and we agree.  (See *Zabelle*, at pp. 1108-1109.)

Defendant argues the case must be remanded for resentencing because the trial court imposed the upper term based on circumstances in aggravation that were not proven in compliance with the recent amendments.  The People argue remand for resentencing is not required because any error was harmless.  The Courts of Appeal are split on how to assess harmlessness in cases like this.  (See *People v. Lewis* (2023) 88 Cal.App.5th 1125, 1131-1138 [discussing various approaches], , review granted May 17, 2023, S279147.)  The Supreme Court has granted review in several cases to decide what standard applies on appeal when determining whether a case should be remanded for resentencing in light of the amendments to section 1170.[12]  Until the Supreme Court decides the issue, we will generally follow the test articulated by another panel of this court in *Zabelle, supra*,

---

[11]  The trial court may also consider "the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury," but this provision is inapplicable in this case.  (§ 1170, subd. (b)(3).)

[12]  See, e.g., *People v. Lynch* (May 27, 2020, C094174) (nonpub. opn.), review granted August 10, 2022, S274942; *People v. Dunn* (2022) 81 Cal.App.5th 394, review granted October 12, 2022, S275655.

80 Cal.App.5th 1098.

In *Zabelle*, the court held that harmlessness must be evaluated under both the *Chapman* test, which applies to violations of the federal constitution, and the *Watson* test, which applies to errors involving state law.[13] (*Zabelle, supra*, 80 Cal.App.5th at pp. 1110-1112.) Under the *Chapman* test, if we conclude beyond a reasonable doubt the jury would have found true beyond a reasonable doubt a single aggravating circumstance, the error is harmless. (*Id*. at pp. 1112-1113.) Under *Watson*, we must consider two questions. "We must first, for each aggravating fact, consider whether it is reasonably probable that the jury would have found the fact not true. We must then, with the aggravating facts that survive this review, consider whether it is reasonably probable that the trial court would have chosen a lesser sentence had it considered only these aggravating facts." (*Id*. at p. 1112.)

The trial court found four aggravating circumstances: (1) the victim was particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3)); (2) defendant was convicted of other crimes for which consecutive sentences could have been imposed but for which concurrent sentences are being imposed (Cal. Rules of Court, rule 4.421(a)(7)); (3) the manner in which the crime was carried out indicates planning, sophistication, or professionalism (Cal. Rules of Court, rule 4.421(a)(8)); and (4) defendant took advantage of a position of trust or confidence to commit the crime (Cal. Rules of Court, rule 4.421(a)(11)). As for the second aggravating circumstance, the jury convicted defendant on 16 counts, and on one of those counts (count 22), the trial court sentenced him to a concurrent term rather than a consecutive term. Defendant acknowledges this circumstance is "jury-based." We assume this means he either acknowledges a jury would have found this circumstance true beyond a reasonable doubt, or he does not

---

[13]     The *Chapman* test takes its name from *Chapman v. California* (1967) 386 U.S. 18, and the *Watson* test takes its name from *People v. Watson, supra*, 46 Cal.2d 818.

44

contest the trial court's reliance on this circumstance.  In either event, because the trial court properly relied on at least one of the aggravating circumstances, we find the error harmless under the *Chapman* test.

That leaves the *Watson* test.  As defendant notes, the first, third, and fourth circumstance were not submitted to the jury, and he argues we cannot conclude it is reasonably probable the jury would have found them true beyond a reasonable doubt.

At first blush, the first aggravating circumstance—the victim was particularly vulnerable—appears easy.  Count 11 involved E.M., the woman whose husband had recently passed away, and who testified she felt mentally unstable and was suffering from anxiety and depression as a result.  We certainly find she was particularly vulnerable.  We are mindful, however, that our Supreme Court has noted vulnerability is a "subjective standard," and determining whether a victim was particularly vulnerable "require[s] an imprecise quantitative or comparative evaluation of the facts." (*People v. Sandoval* (2007) 41 Cal.4th 825, 840.)  As a result, "it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." (*Ibid.*)  Accordingly, we find there is a reasonable probability the jury would have found this circumstance not true.

We also cannot say with confidence that the jury would have found the third aggravating circumstance (the manner in which the crime was carried out indicated planning, sophistication, or professionalism) true beyond a reasonable doubt.  The only explanation the trial court gave for any of its findings was that defendant was convicted of inappropriately touching six women over a period of several years, which suggests "a habit or practice" rather than an "unusual occurrence."  Given defendant's testimony that he gave around 4,000 massages during the relevant time period and about 40 to 50 percent of his clients were women, and that fact that the offenses were spread out over a period of years, a reasonable jury could find defendant's crimes were infrequent, random,

45

and occurred when the opportunity presented itself and without much planning, sophistication, or professionalism.

As for the fourth aggravating circumstance, we conclude the jury would have found true beyond a reasonable doubt that defendant took advantage of a position of trust or confidence to commit the crime. As we noted above, massage therapists hold themselves out to the public as professionals who are trained in the art of using massage to relieve stress and for therapeutic purposes. Like physicians and other medical providers, massage therapists "occupy a position of implicit trust" vis-à-vis their clients, and clients rely on this trust when allowing massage therapists access to the most intimate parts of their bodies. (*Pham, supra*, 180 Cal.App.4th at p. 926.) Defendant took advantage of this position of trust every time he inappropriately touched a client during a massage.

We are thus satisfied the jury would have found true two of the four aggravating circumstances the trial court relied on in imposing the upper term. As in *Zabelle*, however, "we are not convinced the trial court would have found these circumstances alone sufficient to warrant imposition of the upper term sentence. The trial court gave no particular weight to any of its listed aggravating circumstances. Nor did it indicate whether its decision to impose the upper term was (or was not) a close call." (*Zabelle, supra*, 80 Cal.App.5th at p. 1115.) The trial court simply laid out the various factors in aggravation and mitigation and then stated, "For all those reasons, the Court finds that the factors in aggravation greatly outweigh the factors in mitigation, supporting the upper term in sentencing." On this record, we cannot determine whether the trial court would have issued the same sentence had it been left with only two aggravating circumstances. We thus remand for resentencing.

## DISPOSITION

Defendant's conviction on counts 4, 14, and 20 is reversed. On counts 14 and 20, the People have the option to either retry defendant, or accept our modification of the judgment to reflect a conviction for misdemeanor sexual battery. The sentence in count 11 is vacated and remanded to the trial court for full resentencing consistent with section 1170, as amended. The judgment is otherwise affirmed.

<br>

                                                  /s/

                                                EARL, P. J.

I concur:

/s/

KRAUSE, J.

I concur; as to part V, I concur in the result.

/s/

MAURO, J.